UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAT LONG INFRASTRUCTURE, LLC and DANIEL ROBERT URBAN,<br><br>Plaintiffs,<br><br>- against –<br><br>CITY CAPITAL NY, LLC, DYNASTY CAPITAL 26, LLC, LEGACY CAPITAL 26, LLC, MYNT ADVANCE, LLC, UNLIMITED FUNDING GROUP, LLC, YOEL GETTER, CHANAN FUZAILOV and GAVRIEL YITZCHAKOV,<br><br>Defendants. | Case No.:<br><br>COMPLAINT |

Plaintiffs Lat Long Infrastructure, LLC and Daniel Robert Urban (jointly, "Plaintiffs"), by their attorneys, Leech Tishman Robinson Brog, PLLC, as and for their Complaint against defendants City Capital NY, LLC, Dynasty Capital 26, LLC, Legacy Capital 26, LLC, Mynt Advance, LLC, Unlimited Funding Group, LLC, Yoel Getter, Chanan Fuzailov and Gavriel Yitzchakov (collectively, "Defendants"), allege as follows:

Introduction

1. With this action, Plaintiffs seek to hold Defendants accountable for participating in a criminal enterprise that profits by making and collecting on illegal loans

The Parties

2. Plaintiff Lat Long Infrastructure, LLC ("Lat Long") is a Delaware limited liability company with a principal address of 9901 Brodie Lane, Suite 160, Austin, Texas 78748.

3. Plaintiff Daniel Robert Urban ("Urban") is an individual residing in Texas.

1

4. Urban is the principal member of Lat Long.

5. Defendant City Capital NY, LLC ("City Capital NY") is a Connecticut limited liability company that purports to have a principal address at 360 Bloomfield Avenue, Suite 301, Windsor, Connecticut 06095.

6. Defendant Dynasty Capital 26, LLC ("Dynasty Capital") is a New York limited liability company that purports to have a principal address at 96-14 Metropolitan Avenue, 2nd Floor, Forest Hills, New York 11375.

7. Defendant Legacy Capital 26, LLC ("Legacy Capital") is a New York limited liability company that purports to have a principal address at 200 Garden City Plaza, Suite 405, Garden City, New York 11530.

8. Defendant Mynt Advance, LLC ("Mynt Advance") is a Florida limited liability company that is registered to do business in New York and purports to have a principal address at 200 Central Avenue, Farmingdale, New Jersey 07727.

9. Defendant Unlimited Funding Group, LLC ("Unlimited Funding") is a New York limited liability company that purports to have a principal address at 20 West 47th Street, Room 202, New York, New York 10036.

10. Defendant Yoel Getter (a.k.a. Joel Geta) ("Getter") is, upon information and belief, a citizen of Florida, who resides at 56 Bal Bay Drive, Bal Harbour, Florida 33154.

11. Defendant Chanan Fuzailov ("Fuzailov") is, upon information and belief, a citizen of New York, who resides at 138-15 77th Avenue, Flushing, New York 11367.

4875-6830-3950, v. 2

12. Defendant Gavriel Yitzchakov (a.k.a. Gabriel Issacov) ("Yitzchakov") is, upon information and belief, a citizen of Florida, who resides at 3726 Prairie Avenue, Miami Beach, Florida 33140.

## Jurisdiction and Venue

13. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because Plaintiffs' claim for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961, arise under the Constitution, laws, or treaties of the United States.

14. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(l) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

15. Venue is proper in this District pursuant to 28 U.S.C. § 139l(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in the District.

16. Each of the Defendants is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself to the jurisdiction of this Court, regularly transacts business within the State of New York, and/or has purposefully availed itself/himself of the jurisdiction of this Court with respect to the specific transactions at issue.

## Aiding and Abetting and Concerted Action

17. In committing the wrongful acts challenged in this Complaint, Defendants have pursued or joined in the pursuit of a common course of action and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful

conduct giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

18. Each of the Defendants aided and abetted and rendered substantial assistance in the wrong as detailed herein. In taking such actions to substantially assist in the commission of the wrongdoing detailed herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## Facts Common to All Counts

### A. Defendants' Business Model

19. Defendants are participants in a criminal enterprise ("the Lending Enterprise") that profits by making and collecting on illegal loans.

20. Defendants target and prey upon small businesses who are unable to quickly obtain conventional funding from banks and traditional lenders.

21. In desperate need of cash to keep their businesses afloat, small business owners succumb to Defendants' misrepresentations, high-pressure sales tactics, and false promises of readily available, short-term funding.

22. Defendants seek to evade usury laws by disguising their illegal loans as "merchant cash advances" where Defendants purport to purchase a merchant's accounts receivable at an extreme discount.

23. In reality, the cash advances that Defendants make to merchants are criminally usurious loans that are in no way tied to the value of the merchants' accounts receivable and

must be repaid on a fixed schedule regardless of the merchants' actual income during the repayment period.

24. The illegal loans made by Defendants are underwritten based on Defendants' ability to collect, rather than the merchants' ability to repay the dept without going out of business. Indeed, when underwriting new transactions, Defendants do not even consider the nature of the merchants' receivables, which are the assets purportedly purchased. Rather, Defendants focus on the merchants' credit ratings and bank account balances.

25. Defendants routinely make knowingly false and misleading statements to induce merchants to enter into illegal loan agreements.

26. To maximize the profits on their already illegal loans, Defendants constantly pressure merchants to enter into refinance agreements that effectively require merchants pay interest upon interest.

27. Defendants almost always use fake names and addresses when dealing with merchants. For example, Getter uses the alias "Joel Geta", and Yitzchakov uses the alias "Gabe Isaacov".

B. *Lat Long's agreements with Dynasty Capital, Legacy Capital, Mynt Advance, and Unlimited Funding*

28. Between May 23, 2022 and November 18, 2022, Lat Long entered into multiple different agreements with Dynasty Capital, Legacy Capital, Mynt Advance, and Unlimited Funding.

29. Upon information and belief, Dynasty Capital, Legacy Capital, Mynt Advance and Unlimited Funding are all owned and controlled by Fuzailov.

5

30. Upon information and belief, Yitzchakov provides some of the money that Dynasty Capital, Legacy Capital, Mynt Advance and Unlimited Funding use to make illegal loans.

### *(i) The First Legacy Agreement and the Legacy Refi Agreements*

31. On or about May 23, 2022, Lat Long and Legacy Capital entered into an agreement (the "First Legacy Agreement") whereby Legacy Capital would loan Lat Long $500,000, less $50,000 in fees.

32. Repayment of Legacy Capital's $500,000 loan to Lat Long was secured by, *inter alia*, a personal guarantee signed by Urban.

33. In exchange for receiving the $500,000 loan pursuant to the First Legacy Agreement, Lat Long was required to pay Legacy Capital $750,000 via a series of $7,500 payments. More specifically, Legacy Capital was authorized to debit $7,500 directly from Lat Long's bank account on every business day until the loan was repaid.

34. The $50,000 in fees that Lat Long was required to pay pursuant to the First Legacy Agreement (a) did not reflect any specific costs incurred by Legacy Capital; (b) was simply an additional source of profit for Legacy Capital; and (c) constituted additional interest charged to Lat Long.

35. If the $50,000 in fees that Lat Long paid to Legacy Capital is considered interest, the First Legacy Agreement required Lat Long to repay the $500,000 loan with interest at a rate of 243.35 percent *per annum*.

36. If the $50,000 in fees that Lat Long paid to Legacy Capital is not considered interest, the First Legacy Agreement required Lat Long to repay the $500,000 loan with interest at a rate of 182.50 percent *per annum*.

37. In the months following the execution of the First Legacy Agreement, Legacy Capital pressured Lat Long to enter into a series of further agreements (the "Legacy Refi Agreements") whereby Legacy Capital would loan Lat Long additional funds and charge Lat Long additional fees.

38. Legacy Capital did not send Lat Long the majority of the funds loaned to Lat Long pursuant to the Legacy Refi Agreements. Instead, Legacy Capital applied those funds to interest that Lat Long allegedly owed in connection with prior transactions.

39. Repayment of the loans made to Lat Long pursuant to the Legacy Refi Agreements was secured by, *inter alia*, personal guarantees signed by Urban.

40. Each of the Legacy Refi Agreements required Lat Long to repay a loan with interest at a rate of over 150 percent *per annum*.

### *(ii) The First Dynasty Agreement and the Dynasty Refi Agreements*

41. On or about May 24, 2022, Lat Long and Dynasty Capital entered into an agreement (the "First Dynasty Agreement") whereby Dynasty Capital would loan Lat Long $500,000, less $50,000 in fees.

42. Repayment of Dynasty Capital's $500,000 loan to Lat Long was secured by, *inter alia*, a personal guarantee signed by Urban.

43. In exchange for receiving the $500,000 loan pursuant to the First Dynasty Agreement, Lat Long was required to pay Dynasty Capital $750,000 via a series of $10,500

7

payments. More specifically, Dynasty Capital was authorized to debit $10,500 directly from Lat Long's bank account on every business day until the loan was repaid.

44. The $50,000 in fees that Lat Long was required to pay pursuant to the First Dynasty Agreement (a) did not reflect any specific costs incurred by Dynasty Capital; (b) was simply an additional source of profit for Dynasty Capital; and (c) constituted additional interest charged to Lat Long.

45. If the $50,000 in fees that Lat Long paid to Dynasty Capital is considered interest, the First Dynasty Agreement required Lat Long to repay the $500,000 loan with interest at a rate of 337.95 percent *per annum*.

46. If the $50,000 in fees that Lat Long paid to Dynasty Capital is not considered interest, the First Dynasty Agreement required Lat Long to repay the $500,000 loan with interest at a rate of 253.46 percent *per annum*.

47. In the months following the execution of the First Dynasty Agreement, Dynasty Capital pressured Lat Long to enter into a series of further agreements (the "Dynasty Refi Agreements") whereby Dynasty Capital would loan Lat Long additional funds and charge Lat Long additional fees.

48. Dynasty Capital did not send Lat Long the majority of the funds loaned to Lat Long pursuant to the Dynasty Refi Agreements. Instead, Dynasty Capital applied those funds to interest that Lat Long allegedly owed in connection with prior transactions.

49. Repayment of the loans made to Lat Long pursuant to the Dynasty Refi Agreements was secured by, *inter alia*, personal guarantees signed by Urban.

50. Each of the Dynasty Refi Agreements required Lat Long to repay a loan with interest at a rate of over 150 percent *per annum*.

### *(iii) The First Mynt Agreement*

51. On or about May 31, 2022, Lat Long and Mynt Advance entered into an agreement (the "First Mynt Agreement") whereby Mynt Advance would loan Lat Long $850,000, less $42,500 in fees.

52. Repayment of Mynt Advance's $850,000 loan to Lat Long was secured by, *inter alia*, a personal guarantee signed by Urban.

53. In exchange for receiving the $850,000 loan pursuant to the First Mynt Agreement, Lat Long was required to pay Mynt Advance $1,274,150 via a series of $14,157.88 payments. More specifically, Mynt Advance was authorized to debit $14,157.88 directly from Lat Long's bank account on every business day until the loan was repaid.

54. The $42,500 in fees that Lat Long was required to pay pursuant to the First Mynt Agreement (a) did not reflect any specific costs incurred by Mynt Advance; (b) was simply an additional source of profit for Mynt Advance; and (c) constituted additional interest charged to Lat Long.

55. If the $42,500 in fees that Lat Long paid to Mynt Advance is considered interest, the First Mynt Agreement required Lat Long to repay the $850,000 loan with interest at a rate of 234.37 percent *per annum*.

56. If the $42,500 in fees that Lat Long paid to Mynt Advance is not considered interest, the First Mynt Agreement required Lat Long to repay the $850,000 loan with interest at a rate of 202.36 percent *per annum*.

### (iv) The First Unlimited Agreement

57. On or about August 4, 2022, Lat Long and Unlimited Funding entered into an agreement (the "First Unlimited Agreement") whereby Unlimited Funding would loan Lat Long $350,000.

58. Repayment of Unlimited Funding's $350,000 loan to Lat Long was secured by, *inter alia*, a personal guarantee signed by Urban.

59. In exchange for receiving the $350,000 loan pursuant to the First Unlimited Agreement, Lat Long was required to pay Unlimited Funding $524,650 via a series of $5,829 payments. More specifically, Unlimited Funding was authorized to debit $5,829 directly from Lat Long's bank account on every business day until the loan was repaid.

60. The First Unlimited Agreement required Lat Long to repay the $350,000 loan with interest at a rate of 202.36 percent *per annum*.

### (v) The November 2022 Agreements

61. On or about November 18, 2022, Lat Long entered into new agreements with Legacy Capital, Dynasty Capital, Mynt Advance, and Unlimited Funding (collectively, "the November 2022 Agreements").

62. The November 2022 Agreements increased the total debt Lat Long owed to Legacy Capital, Dynasty Capital, Mynt Advance, and Unlimited Funding to $4,594,500, which was considerably more than the amount Lat Long owed at that time pursuant to the First Mynt Agreement, the First Unlimited Agreement, the Legacy Refi Agreements, and the Dynasty Refi Agreements.

63. The November 2022 Agreements required Lat Long to pay its purported $4,594,500 debt by via payments totaling $143,578.13 per week for thirty-two weeks.

64. The transactions contemplated in the November 2022 Agreements were simply more illegal, usurious loans that increased Lat Long's alleged debt by hundreds of thousands of dollars and required Lat Long to repay that alleged debt at a rate of well over 50 percent *per annum*.

C.   *Fuzailov and Yitzchakov threaten to hurt Urban.*

65. In or around December 2022, Fuzailov and Yitzchakov learned that Lat Long was attempting to find a new source of funds that Lat Long could use to payoff the debts purportedly owed to Legacy Capital, Dynasty Capital, Mynt Advance, and Unlimited Funding.

66. Furious that they would be deprived of the opportunity to make additional usurious loans to Lat Long in the future, Fuzailov and Yitzchakov retaliated. Fuzailov used Lat Long's login credentials to access Lat Long's bank accounts. Fuzailov then tried to transfer hundreds of thousands of dollars from Lat Long's accounts to entities that Fuzailov controls.

67. When Lat Long succeeded in blocking those transfers, one or more individuals associated with Fuzailov and Yitzchakov contacted Urban and threatened physical violence unless Lat Long stopped blocking Fuzailov's attempts to drain Lat Long's account.

### D. Fuzailov and Yitzchakov conspire with Getter

68. In an effort to continue their profitable relationship with Lat Long, Fuzailov and Yitzchakov conspired with Getter to induce Lat Long to enter into more illegal loan agreements.

69. In or around December 2022, Getter contacted Lat Long. Getter led Lat Long to believe that Getter's company, City Capital NY, was not associated with Fuzailov or Yitzchakov, but that City Capital NY had entered into an arms-length transaction to purchase the debt that Lat Long owed to Legacy Capital. Getter's representations to Lat Long were false. In fact, Getter was working closely, and had agreed to share future profits generated from Lat Long, with Fuzailov and Yitzchakov.

70. On or about December 22, 2022, Lat Long and City Capital NY entered into an agreement (the "City Capital Agreement") whereby City Capital NY would loan Lat Long $2,000,000, less an unspecified amount of fees.

71. Repayment of City Capital NY's $2,000,000 loan to Lat Long was secured by, *inter alia*, a personal guarantee signed by Urban.

72. In exchange for receiving the $2,000,000 loan pursuant to the City Capital Agreement, Lat Long was required to pay City Capital NY $2,998,000 via a series of $29,980 payments. More specifically, City Capital NY was authorized to debit $29,980 directly from Lat Long's bank account on every business day until the loan was repaid.

73. At the time Lat Long entered into the City Capital Agreement, Getter represented that (a) a portion of the $2,000,000 loan would be applied toward the debt that City Capital NY had supposedly acquired from Legacy Capital; (b) a portion of the

$2,000,000 loan would be used to pay City Capital NY's fees; and (c) Lat Long would receive the balance of $200,000. City Capital NY never disclosed the exact amount of its fees and sent Lat Long just $100,000.

74. Even assuming that City Capital NY did not charge Lat Long any fees in connection with the City Capital Agreement (it did) and actually repaid Lat Long's debt to Legacy Capital (it did not), the City Capital Agreement required Lat Long to repay the $2,000,000 loan with interest at a rate of 182.14 percent *per annum*.

### D. *The Loan Agreements are unconscionable*

75. All of the agreements between Lat Long and the Lending Enterprise, including the First Legacy Agreement, the Legacy Refi Agreements, the First Dynasty Agreement, the Dynasty Refi Agreements, the First Mynt Agreement, the First Unlimited Agreement, the November 2022 Agreements, and the City Capital Agreement (collectively, the "Loan Agreements") are unconscionable contracts of adhesion that were not negotiated at arms-length.

76. The Loan Agreements contain one-sided terms that are designed to conceal the true nature of the underlying transactions. For example, the Loan Agreements: (a) give the Lending Enterprise the irrevocable right to withdraw money directly from Lat Long's bank accounts; (b) prevent Lat Long from transferring or selling its business or assets without permission from the Lending Enterprise; (c) require Lat Long to pay attorneys' fees that the Lending Enterprise incurs in collecting on the illegal loans; (d) include waivers of trial by jury and class action waivers; and (e) prohibit Lat Long from obtaining financing from other sources without the permission of the Lending Enterprise.

77. The Loan Agreements also contain numerous false statements, including that: (a) the transactions at issue are not loans; and (b) the payments that Lat Long was required to make represented good-faith estimates of, or otherwise corresponded with, Lat Long's receivables.

## First Claim for Relief
## (RICO - 18 U.S.C. § 1962)

78. Plaintiffs repeat and reallege each of the allegations contained in the paragraphs above, as if fully set forth herein.

79. Defendants are separate individuals or entities that, by virtue of one or more contracts or agreements, are associated with each other for the purpose of originating, underwriting, servicing, and collecting illegal, usurious loans throughout the United States.

80. Defendants' association constitutes a single association-in-fact enterprise within the meaning of 18 U.S.C. § 1962(c), as the term is defined in 18 U.S.C. § 1961(4).

81. The Lending Enterprise engages in illegal activity by entering into illegal financing agreements and attempting to collect unlawful debts.

82. The Lending Enterprise has an existence separate and apart from its illegal activity.

83. Each of the Defendants has a distinct role in the Lending Enterprise.

84. Upon information and belief, Yitzchakov provides money that City Capital NY, Dynasty Capital, Legacy Capital, Mynt Advance, and Unlimited Funding use to make illegal loans.

85. Upon information and belief, Getter and Fuzailov service and collect the illegal loans on behalf of the Lending Enterprise and exercise managerial authority over the Lending Enterprise.

86. The Lending Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

87. Members of the Lending Enterprise maintain offices in New York and use personnel in those offices to originate, underwrite, fund, service and collect on illegal loans made to borrowers in Texas and throughout the United States. In doing so, those members of the Lending Enterprise make extensive use of interstate emails, telephone calls, wire transfers and electronic bank withdrawals.

88. All communications between the Lending Enterprise and Plaintiffs were by interstate email, telephone calls, wire transfers or other interstate wire communications. Specifically, the Lending Enterprise used interstate emails and telephone calls to (a) originate, underwrite, service and collect upon the illegal loans made to Lat Long; (b) fund the illegal loans made to Lat Long; and (c) collect amounts due from Lat Long pursuant to the Loan Agreements.

89. The obligations imposed on Lat Long pursuant to the Loan Agreements constitute unlawful debts within the meaning of 18 U.S.C. 1962(c) because the loans made pursuant to those agreements (a) violate applicable criminal usury statutes, and (b) charge interest at rates more than twice the rate allowable by law.

4875-6830-3950, v. 2

90. Defendants participated in the Lending Enterprise or participated in the affairs of the Lending Enterprise, directly or indirectly, though the collection of an unlawful debt in violation of 18 U.S.C. 1962(c).

91. Defendants have unlawfully, knowingly, and willfully, combined, conspired, and agreed together to collect an unlawful debt in violation of 18 U.S.C. § 1962(d).

92. By and through their collective business relationships, and their close coordination with respect to underwriting, funding, servicing, and collecting on unlawful loans, each of the Defendants knew the nature of the Lending Enterprise and knew that the Lending Enterprise extended beyond each of the Defendant's specific role in the Lending Enterprise.

93. Through their connections and coordination, each of the Defendants combined to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means.

94. Defendants acted maliciously, without legal justification, and with the intent of injuring Plaintiffs.

95. Defendants have engaged in a civil conspiracy.

96. In the course of their civil conspiracy, Defendants committed one or more unlawful, overt acts.

97. Each of the Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Lending Enterprise's affairs in order to collect unlawful debts, including pursuant to the Loan Agreements.

98. Each of the Defendants was a knowing, willing, and active participant in the Lending Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon the unlawful debts at issue.

99. The participation and agreement of each of the Defendants was necessary to perpetrate their scheme to solicit, underwrite, fund, and collect upon the unlawful debts.

100. Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

101. The injuries to Plaintiffs include, but are not limited to, hundreds of thousands of dollars in improperly collected interest and fees, plus attorneys' fees and costs associated with exposing Defendants' misconduct.

102. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees.

**WHEREFORE**, Plaintiffs demand judgment:

(a) Awarding Plaintiffs compensatory damages;

(b) Awarding Plaintiffs treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c);

(c) Declaring the Loan Agreements to be invalid:

(d) Requiring Defendants to return the full amount of the funds they received from Lat Long; and

(e) Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York
February 2, 2023

                                       LEETCH TISHMAN ROBINSON BROG, PLLC
                                       *Attorneys for Plaintiffs*

                                       By:   /s/ Matthew Cono Capozzoli
                                                  Matthew Cono Capozzoli